## Richmond

Billy C. Brooks, Administrator, Etc. v. Marshall Hufham.

January 26, 1959.

Record No. 4845.

Present, All the Justices.

The opinion states the case.

*E. Ralph James* (*James, Richardson & James*, on brief), for the plaintiff in error.

*Frank H. Pitchford* (*Mayer A. Sarfan*, on brief), for the defendant in error.

Miller, J., delivered the opinion of the court.

Marshall Hufham, owner and occupant of a Buick automobile that was being driven by his brother, Leroy Hufham, was severely injured when that car collided with a Chevrolet sedan occupied by

Joseph Butler Pierce, Joseph Thomas Wiggins, and Early Anderson Whittaker. Leroy Hufham, Joseph Butler Pierce, owner of the Chevrolet car, and Joseph Thomas Wiggins died as a result of the collision.

A. S. White qualified as administrator on the estate of Joseph Thomas Wiggins, and Billy C. Brooks qualified as administrator on the estate of Joseph Butler Pierce. Marshall Hufham instituted action for damages against both administrators, and Early Anderson Whittaker. The litigants will at times be referred to as plaintiff and defendants in accordance with their positions in the trial court. Plaintiff's motion for judgment contained four counts. Count 1 alleged that Pierce was the driver of the Chevrolet car, Count 2 that Wiggins was the driver, Count 3 that Whittaker was the driver, and Count 4 alleged that all three were driving the Chevrolet "in furtherance and as a part of a joint venture and undertaking by them."

Each administrator filed an affidavit, answer and grounds of defense denying that his decedent was operating the Chevrolet car individually or as agent for either of the other occupants, and Whittaker filed a similar affidavit, answer and grounds of defense. It was thus incumbent upon plaintiff to prove who was the operator of the car and that the negligence of the operator was a proximate cause of the collision.

When the hearing of all evidence was concluded, the three defendants moved the court to strike the evidence on the grounds that it was insufficient to prove who was driving the Chevrolet car or to establish that negligence on the part of that driver, whoever he may have been, was a proximate cause of the collision. The motion was sustained as to Wiggins' administrator and Whittaker. It was overruled as to Pierce's administrator, yet in making that ruling the court expressed doubt as to the sufficiency of the evidence to sustain a finding against that defendant. The case was put to the jury as to that defendant's liability and resulted in a verdict for plaintiff, upon which judgment was entered.

Numerous assignments of error were taken by the administrator but his chief assignments challenge the sufficiency of the evidence to sustain the verdict and judgment. They are to the effect that the evidence fails to prove who was driving the Chevrolet car when the accident occurred or that its driver was guilty of negligence that was a proximate cause of the collision.

The accident occurred on November 30, 1956, about 9:30 p.m. on State route 134 in York county, Virginia. Route 134, a two-lane, hard-surfaced road runs generally in a westward direction from Sinclair Circle in the city of Hampton towards Yorktown and to its intersection with route 17. Rosetti's Drive-In, a negro tavern and pool room, which has a very wide entrance and ample parking space between the building and highway, is situated on the north side of route 134 about six miles from Sinclair Circle. The collision occurred in front of Rosetti's where the highway is straight and divided by a broken white line.

On the day of the accident Leroy Hufham was visiting plaintiff who lived in Portsmouth; when plaintiff ceased work about 3:30 p.m., they both took a "shot glass" of whiskey each, "had supper," visited a friend and went to a burlesque in Norfolk. When they left the burlesque about 7:30, they decided to visit Floyd Lindsey, one of plaintiff's fellow workers who lived in Yorktown.

Plaintiff had been driving his Buick car and did so until the ferry on which they crossed Hampton Roads docked at Old Point. There he asked his brother to drive, and plaintiff then went to sleep on the back seat of the automobile. When they arrived at Sinclair Circle on route 134, Leroy asked plaintiff for directions. He was instructed to proceed along route 134 and told by plaintiff to let him know when they reached route 17. Plaintiff said that he could not doze because his brother was talking to him, but he leaned back and tried to rest as his brother drove on beyond Langley Field. He described how he was aroused and what he heard and saw when the accident happened as follows:

"I was leaning against the back seat, sort of trying to rest and I heard him holler and brakes squealed and I opened my eyes and lights coming right at me and everything went black."

After giving this account on his direct examination of what he was doing, heard and saw, he thereafter on cross-examination said that the speed of their car was "about forty-five, fifty, somewhere along there" miles an hour and that they were proceeding along the west bound lane toward Yorktown.

Whittaker was so seriously injured that he could remember nothing that happened after about nine o'clock that evening; he did not know who was driving, in which direction they were proceeding, or any particulars of the accident.

After the impact plaintiff's Buick came to rest on its side, headed east, on the shoulder of the west bound lane. The Chevrolet was turned upside down with its wheels in the air, off the hard surface of the road about thirty-four feet from the debris and near a telegraph pole toward the far western end of the wide entrance into Rosetti's place.

Tommy Baytop, who was in Rosetti's and heard but did not see the collision, testified that when he went out, Whittaker was lying on the ground between the left side of the upturned Chevrolet and the telegraph pole. He did not look into the automobile until after it was set on its wheels by turning it over to its right. He then observed that Wiggins was next to the right door on the front seat, and Pierce was leaning up against him with "his head laying on him" and both legs under the steering wheel. This witness also stated that the men were removed from the right side of the car because the door on the left was tight and could not be opened after the car was placed on its wheels.

Pierce lived with his father; Margaret Brown, his aunt, who lived on Bethel road in sight of the Pierce home, testified that about nine o'clock Pierce and his two companions left her home in the Chevrolet car. They had been there for only a short time. Her house is about .65 mile distant and toward Yorktown from Rosetti's tavern. The movements of the car and its three occupants during the thirty minutes that elapsed after they left Margaret Brown's and before the collision are unknown through Margaret Brown said that Pierce had dressed "to go down to the pool parlor he said." She did not know who was driving the car when the three left, but in reply to questions, she said that they had not been drinking when they came to or left her home.

William Coles testified that Pierce had been in Rosetti's fifteen or twenty minutes before the accident, that he had played a game of pool with him, and that he heard the crash shortly after Pierce left. However, Meredith Hines, the operator of Rosetti's, stated he saw Pierce shooting pool about two and a half hours before the accident but had not seen him thereafter.

John Ed Hopson arrived at the scene of the accident shortly after it happened. He testified that the Buick car, traveling eastwardly as was he, passed him on a curve on route 17 some distance west of Rosetti's, running in excess of sixty miles an hour and that he had to drive onto the shoulder of the road to let it pass. Hopson drove

to a place called Tabb School, and after finding no one there, he went to Rosetti's where he saw the wrecked cars. He identified the Buick as a dark green or gray automobile with a light top, and he was sure that the wrecked Buick was the same one that had passed him and then passed a car driven by John Collins, which was ahead of him and likewise traveling eastwardly.

Robert Wormley, Jr., a passenger in Hopson's car, also identified the Buick as the car that passed them on route 17, traveling eastwardly "like it was going to a fire or something."

John Collins testified that he was driving along route 17 in an easterly direction, followed by Hopson. He saw Hopson run off the road and then the Buick passed him. Collins also drove on to Tabb School and went in but found no one there for whom he was looking. He then went to Rosetti's where he observed the wrecked cars. He identified the Buick as the car that he had seen traveling eastwardly and that had passed him on route 17.

Harry D. Riley, special officer of York county, arrived at the scene about 9:45 p.m. and saw Wiggins, Whittaker and Pierce lying on the ground. He observed skidmarks in the road but could not connect any of them with the accident. This officer said that the area was a known gathering place for "hot-rodders" and skidmarks had been found in the area on numerous occasions. Upon examination he could detect no pulse beat or breathing by Wiggins, but Pierce and Whittaker were alive, and he noticed a strong odor of alcohol on the breath of each.

State Trooper Kendall F. Rowe investigated the accident about 10 p.m. He found the Buick in the west bound lane of route 134, headed east, and the Chevrolet in the parking lot in front of Rosetti's about fifteen feet from the edge of the highway and headed toward the highway. He saw debris all over the road, but concentrated in the west bound lane, observed fifty-one feet of skidmarks in front of the Buick ending twenty-six feet from that car, but found no marks leading from the debris to either vehicle, and he could not determine the point of impact. He also testified that thereafter at the hospital plaintiff told him that when the collision occurred, he was in the back seat sleeping and that his brother was driving.

After Pierce was taken to the hospital and while unconscious, some of his blood was drawn for the purpose of making a "compatability test for a transfusion," which is a routine procedure in accident cases. A sample of this blood was obtained by officer

Rowe after Pierce's death from which to make a blood alcohol analysis. A certificate of the analysis made by the State medical examiner and duly signed disclosed that Pierce's blood contained a .22 per cent alcoholic content. This certificate was offered by plaintiff and admitted in evidence over defendant's objection.

Upon the authority and for the reasons stated in *Ann Russell, Administratrix* v. *James Edward Hammond,* 200 Va. 600, 106 S. E. 2d 626, this day decided, we hold that the certificate showing the alcoholic content of Pierce's blood was inadmissible under § 18-75.2, 1956 Cum Supp., Code 1950. Nor was it admissible under § 19-26, Code 1950, dealing with post mortem examinations, and its receipt in evidence was prejudicial error.

Pictures taken of the two automobiles disclose that both were demolished. The force of the impact appears to have been primarily upon the front of each car, for the Chevrolet was severely crushed along its front and forward right side, and the Buick was more severely damaged on its front than elsewhere. In short, the front of the Buick and the right front part of the Chevrolet seem to have taken the brunt of the collision.

Assuming, but not deciding, that decedent Pierce, the owner of the Chevrolet, was driving when the collision occurred, we address ourselves to the question of whether or not plaintiff has carried the burden of proving that Pierce was guilty of negligence that was a proximate cause of the tragedy.

The evidence is conflicting as to the direction in which the Buick was traveling at the time of the collision. Plaintiff stated that it was being driven westwardly, but other witnesses identified it as the car that had passed them going eastwardly only moments before the impact. Plaintiff's theory is that while the Buick was traveling westwardly along route 134 at forty-five to fifty miles an hour, the Chevrolet, moving eastwardly, made a left turn into Rosetti's Drive-In. The appearance of the vehicles after the collision lends some credence to this view though their location after the accident adds little, if anything, to this theory. Here the observation made in *Richter* v. *Seawell,* 183 Va. 379, 382, 32 S. E. 2d 62, is pertinent:

"* * * It is a matter of common knowledge that if an automobile, traveling at fifty-five miles per hour, or less, gets out of control it may behave in a manner which seemingly defies all laws of physics. * * *"

Defendant's theory is that the Buick, while proceeding eastwardly,

was driven to the left or north side of the road as Pierce's car emerged from Rosetti's Drive-In, and thus the blow was taken on the right front side of the Chevrolet car. Yet neither theory is supported by evidence of preponderating weight, for the physical condition of the cars might have resulted from the collision having happened in either manner.

If we accepted the theory advanced by plaintiff, it must still be remembered that it was not unlawful for the driver of the Chevrolet to make a left turn into Rosetti's provided he exercised reasonable care to see that such movement could be made in safety. Section 46-233, Code 1950; *Smith* v. *Clark*, 187 Va. 181, 46 S. E. 2d 21. The driver of the Chevrolet may have been making a left turn when the accident happened. Yet he is presumed to have been exercising reasonable care in doing so, and mere proof of a collision with another oncoming vehicle fails to establish negligence or show the proximate cause of the collision.

"The party who affirms negligence must establish it by proof sufficient to satisfy reasonable and well balanced minds. The evidence must show more than a probability of a negligent act. An inference cannot be drawn from a presumption, but must be founded upon some fact legally established. This court has repeatedly held that when liability depends upon carelessness or fault of a person, or his agents, the right of recovery depends upon the same being shown by competent evidence, and it is incumbent upon such a plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury, and not be left entirely to conjecture, guess or random judgment, upon mere supposition, without a single known fact. * * *" *Chesapeake & Ohio Railway Co.* v. *Heath*, 103 Va. 64, 66, 48 S. E. 508. *Richter* v. *Seawell, supra*; 13 M. J., Negligence, § 53, p. 572.

It is not amiss to say that had Pierce's intoxication been established, yet the vital fact that his negligence was a proximate cause of the collision would have lacked the necessary proof. What caused the collision and how it occurred would still have been a matter of mere speculation and surmise.

It necessarily follows that the judgment and verdict complained of must be vacated and set aside, and final judgment entered for the defendant.

*Reversed and final judgment.*